*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

S&M BRANDS, INC.; INTERNATIONAL TOBACCO
PARTNERS, LTD.,
             *Plaintiffs-Appellees/Cross-Appellants,*

     *v.*

ROBERT E. COOPER, JR., in his official capacity as
Attorney General of the State of Tennessee,
             *Defendant-Appellant/Cross-Appellee.*

Nos. 06-5828/5829

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00171—Thomas A. Wiseman, Jr., District Judge.

Argued: April 26, 2007

Decided and Filed: May 13, 2008

Before: KENNEDY, MOORE, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** John H. Sinclair, Jr., OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. David F. Dobbins, PATTERSON, BELKNAP, WEBB & TYLER, New York, New York, for Appellees. **ON BRIEF:** John H. Sinclair, Jr., OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. David F. Dobbins, PATTERSON, BELKNAP, WEBB & TYLER, New York, New York, for Appellees.

    McKEAGUE, J., delivered the opinion of the court, in which KENNEDY, J., joined. MOORE, J. (pp. 12-14), delivered a separate dissenting opinion.

---

**OPINION**

---

McKEAGUE, Circuit Judge.  S&M Brands, Inc. and International Tobacco Partners, Ltd. ("ITP") sued the Attorney General of the State of Tennessee in his official capacity.[1]  They claim that the State of Tennessee has violated federal antitrust law and the U.S. Constitution in its implementation and application of the Master Settlement Agreement ("MSA") between various States and major tobacco manufacturers.  The only claim before us in this appeal and cross-appeal is whether the Attorney General's enforcement of an amended escrow provision has had an impermissible retroactive effect in violation of the Plaintiffs' rights to due process.[2]

The district court concluded that, although ITP is not a tobacco product manufacturer, it had standing to seek a release of funds from escrow.  On the merits of the Plaintiffs' due-process claim, the district court granted summary judgment in favor of the Attorney General except as to ITP's claim for a release of escrow funds associated with cigarette sales in 2003.  For the reasons set forth below, we reverse and remand to the district court with instruction to dismiss the case without prejudice on grounds of sovereign immunity.

**I**

**A.**     *The MSA*

By the mid-1990s, numerous States and other governments had sued tobacco manufacturers, alleging a wide range of deceptive and fraudulent practices by the companies.  After a protracted period of negotiation, the attorneys general of forty-six States as well as the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands (the "Settling States") entered into the MSA with four major tobacco companies, Brown & Williamson, Lorillard Tobacco, Phillip Morris, and RJ Reynolds.  The Settling States agreed to dismiss their lawsuits against Participating Manufacturers ("PMs") in exchange for yearly payments and restrictions on tobacco advertising and marketing.

PMs actually consist of two separate groups of tobacco product manufacturers—Original Participating Manufacturers ("OPMs") and Subsequent Participating Manufacturers ("SPMs"). The four original signatories are the OPMs.  SPMs are generally smaller tobacco manufacturers which have subsequently agreed to the terms and conditions of the MSA (e.g., Liggett Group, Tobacco & Candy International).  There is a third group of manufacturers defined under the MSA—Non-Participating Manufacturers ("NPMs").  Any tobacco product manufacturer that has not joined the MSA is considered an NPM.

All PMs make annual payments based on several factors, the primary factor being the number of cigarettes sold domestically.  These payments are pooled together, and the total amount is divided between the Settling States according to set allocation percentages.  Tennessee's allocation percentage equals 2.4408945%. MSA Ex. A.

---

[1] On November 1, 2006, Robert E. Cooper, Jr., was sworn in as the Attorney General for the State of Tennessee, replacing Paul G. Summers.  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Cooper is automatically substituted for former Attorney General Summers.

[2] S&M Brands and ITP also appealed the district court's dismissal of their antitrust claims.  We affirmed in a separate appeal. *S&M Brands, Inc. v. Summers*, 228 F. App'x 560 (6th Cir. 2007).

**B.     *The Escrow Statute***

Because they have not agreed to adopt the MSA, NPMs are not subject to its payment requirements or other restrictions.  However, the Settling States have passed complementary legislation to cover NPMs.  As part of its implementation of the MSA, Tennessee passed the Tennessee Tobacco Manufacturers' Escrow Fund Act of 1999 (the "Escrow Statute"), Tenn. Code § 47-31-101 *et seq*., which was based on a model statute in the MSA. MSA Ex. T.  As explained in that model statute,

> It would be contrary to the policy of the State if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them if they are proven to have acted culpably.  It is thus in the interest of the State to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

*Id.*

Thus, under § 47-31-103(a)(2)(A), NPMs selling cigarettes in Tennessee are required to deposit funds annually into an escrow account in an amount based upon the number of cigarettes sold in the state during the year.  NPMs receive the interest that accrues on the deposited funds.  As for the principal, the Escrow Statute originally provided for the release of funds under any of the following circumstances:

> (i) To pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by the state or any releasing party located or residing in the state. . . .;
>
> (ii) To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the master settlement agreement (as determined pursuant to § IX(i)(2) of the master settlement agreement, and before any of the adjustments or offsets described in § IX(i)(3) of that agreement other than the inflation adjustment) had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer; or
>
> (iii) To the extent not released from escrow under subdivision (a)(2)(B)(i) or (ii), funds shall be released from escrow and revert back to such tobacco product manufacturer twenty-five (25) years after the date on which they were placed into escrow.

Tenn. Code § 47-31-103(a)(2)(B) (2003).  Subsection (ii) is commonly referred to as the Allocable Share Release ("ASR") provision.  The pre-2004 version is called the "Original ASR Provision."

However, the Original ASR Provision contained, in the words of the Attorney General, a "loophole."  Rather than equalizing the payments an NPM would have to make under either the MSA or the Escrow Statute, the Original ASR Provision permitted small, regional NPMs to receive a refund of most of their annual escrow deposits. Specifically, because Tennessee's allocable share under the MSA is only 2.4408945%, the "total payments" that an NPM "would have been required to make" to Tennessee under the MSA were correspondingly small.  Other Settling States experienced similar problems.  If an NPM sold cigarettes in only one or a few of the Settling States,

it could get back most of the escrow deposits it made in those states. Only when an NPM reached a national level would it have to make aggregate escrow deposits that approached the full payments it would have had to make under the MSA.

The NPMs used this cost advantage to gain market share against the PMs. In 2000, PMs had a combined market share of 97.7%. By 2003, that market share had fallen to 93.8%.

In response, Tennessee (along with most of the other Settling States) amended its Escrow Statute. Effective April 20, 2004, Tennessee repealed Subsection (ii) and replaced it with the following:

> (ii) To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the master settlement agreement payments, as determined pursuant to § IX(i) of the master settlement agreement including after final determination of all adjustments, that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer; or

*Id.* § 47-31-103(a)(2)(B)(ii) (2004 Supp.) (the "ASR Amendment"). The new ASR Amendment no longer calculates a refund based on Tennessee's allocable share percentage. Instead, it provides a refund of any amount paid into escrow that the NPM establishes was in excess of the total amount it would have had to pay under the MSA for the year in question. This results in a smaller refund for NPMs that, like the Plaintiffs, sell cigarettes on a regional, rather than national, level.

### C.   *The Contraband Statute*

Tennessee also enacted complementary tax and license legislation, referred to by the Plaintiffs as the "Contraband Statute." *Id.* § 67-4-2601 *et seq.* The primary requirement of the Contraband Statute is an annual certification by each manufacturer that it is in compliance with either the MSA or the Escrow Statute before being included on a directory of tobacco product manufacturers authorized to sell cigarettes in Tennessee. *Id.* § 67-4-2602. The Contraband Statute prohibits anyone from selling, possessing, or affixing tax stamps to cigarettes sold by any manufacturer or importer not included on the directory. *Id.* § 67-4-2602(c).

### D.   *The Plaintiffs' Refund Claims*

The Escrow Statute (pre- and post-amendment) requires any NPM, for each year during which it sells cigarettes in Tennessee, to deposit the requisite amount into escrow for that year no later than April 15th of the following year. *Id.* § 47-31-103(a)(2). For instance, the escrow payment for cigarettes sold in 2003 was due no later than April 15, 2004. On the other hand, the statute does not specify when a refund claim must be made, nor does it specify how long Tennessee has to grant or deny the claim.

The Attorney General takes the position that if a refund claim was made prior to the effective date of the ASR Amendment, then the claim would be governed by the Original ASR Provision. Conversely, any claim submitted on or after that date would be governed by the ASR Amendment. Under this application, S&M Brands was able to receive a refund on its 2003 cigarette sales under the Original ASR Provision because the company made its claim prior to April 20, 2004. The Attorney General refused to apply the Original ASR Provision to ITP's refund claim on 2003 cigarette sales because the company submitted it on April 29, 2004. The Attorney General likewise refused to apply the Original ASR Provision to the Plaintiffs' refund claims for sales between January 1 and April 19, 2004.

The Attorney General further rejected ITP's refund claims on the ground that the company is not a "tobacco product manufacturer" as defined under the Escrow and Contraband Statutes. ITP imports cigarettes manufactured in Armenia by Grand Tobacco, Ltd. ("Grand Tobacco"). It is undisputed that Grand Tobacco is a tobacco product manufacturer and is thereby subject to the Escrow and Contraband Statutes. Grand Tobacco established a qualified escrow fund account and deposits have been made to that account in Grand Tobacco's name. To the extent ITP has deposited funds into escrow relating to cigarette sales in Tennessee, as ITP alleges, it has apparently always done so in the name of and on behalf of Grand Tobacco. ITP made the refund requests as the legal assignee of Grand Tobacco's right to escrow releases.

## II

S&M Brands and ITP sued the Attorney General in federal district court. Although they alleged several causes of action,[3] only one is relevant to the instant appeal and cross-appeal: whether Tennessee's implementation and enforcement of the ASR Amendment has had an impermissibly retroactive effect in violation of the federal Due Process Clause of the Fourteenth Amendment.

The district court issued three separate decisions. In its first decision, the district court granted the Attorney General's motion to dismiss the other causes of action under Federal Rule of Civil Procedure 12(b)(6). *S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 630-35 (M.D. Tenn. 2005) ("*S&M Brands I*"). In doing so, it held that ITP had standing at the pleading stage and that the Eleventh Amendment did not bar the injunctive and declaratory relief requested by the Plaintiffs. *Id.* at 618, 621.

The district court then considered the Plaintiffs' retroactivity claim on the parties' cross motions for summary judgment. The court found no impermissible retroactive effect except as to ITP's claim for a release of funds related to Grand Tobacco's 2003 cigarette sales. *S&M Brands, Inc. v. Summers*, No. 05-171, 2005 WL 3160869, at *8-10 (M.D. Tenn. Nov. 28, 2005) (unpublished). The district court also rejected the Attorney General's request for summary judgment on ITP's standing. *Id.* at *4-6. The court addressed the standing issue a third time when it denied the Attorney General's motion for reconsideration. *S&M Brands, Inc. v. Summers*, 420 F. Supp. 2d 840, 848-49 (M.D. Tenn. 2006).

## III

Both parties on appeal take issue with the district court's holding on whether the Attorney General's enforcement of the ASR Amendment had an impermissible retroactive effect on the Plaintiffs. The Attorney General further argues that ITP does not have standing to bring a due-process claim because it is not a manufacturer. Before reaching the merits or the issue of standing, however, we look first to whether the Attorney General, acting in his official capacity, is immune from suit in federal court. We asked for and received from the parties supplemental letter briefs on the issue. *See Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006) (appellate court can raise the question of sovereign immunity sua sponte because it implicates important questions of federal-court jurisdiction and federal-state comity). Whether sovereign immunity exists is a question of constitutional law that we review de novo. *S.J. v. Hamilton County*, 374 F.3d 416, 418 (6th Cir. 2004).

As this court, sitting en banc, explained in *Ernst v. Rising*, States "possess[] certain immunities from suit in . . . federal courts." 427 F.3d 351, 358 (6th Cir. 2005) (citing *Alden v. Maine*, 527 U.S. 706, 713 (1999); *Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934); *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). The "immunity flows from the nature of sovereignty itself as

---

[3]*See supra* note 2.

well as the Tenth and Eleventh Amendments to the United States Constitution." *Id.* (citing *Alden*, 527 U.S. at 713-14). "The immunity also applies to actions against state officials sued in their official capacity for money damages." *Id.* (citing *Lapides v. Bd. of Regents*, 535 U.S. 613, 616, 623 (2002); *Edelman v. Jordan*, 415 U.S. 651, 664-66 (1974)). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," i.e., against the State. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).

There are three exceptions to a State's sovereign immunity: (a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young*, 209 U.S. 123 (1908), applies; and (c) when Congress has properly abrogated a State's immunity. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 817 (6th Cir. 2000). Because Tennessee has not expressly consented to suit in this case[4] and there is no question that Congress has not abrogated Tennessee's immunity here, only the second exception is at play in this case.

Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law, *Will*, 491 U.S. at 71 & n.10, regardless of whether compliance might have an ancillary effect on the state treasury, *Edelman*, 415 U.S. at 667-68; *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62). The *Ex parte Young* exception does not, however, extend to any retroactive relief. *Quern v. Jordan*, 440 U.S. 332, 338 (1979).

With respect to the Plaintiffs' due-process claim, the district court correctly pointed out that Tennessee has no present ownership interest in the escrow funds. *S&M Brands I*, 393 F. Supp. 2d at 621. The Attorney General admitted this in his answer to the Plaintiffs' complaint. Answer ¶ 69 ("Defendant Summers admits that pursuant to Tenn. Code. Ann. § 47-31-103(a)(2)(B) funds placed in escrow by an NPM remain the property of that NPM, unless and until released as specified in the statute."). All of the interest earned on deposits is paid to the tobacco product manufacturer. Tenn. Code § 47-31-103(a)(2)(B). As for the principal, the excess is returned to the manufacturer, *id.* § 47-31-103(a)(2)(B)(ii), and the remaining portion is either used to compensate any liability the manufacturer might incur from a tobacco-related lawsuit or returned to the manufacturer in twenty-five years, *id.* § 47-31-103(a)(2)(B)(i),(iii). Unless and until Tennessee prevails in a lawsuit against a manufacturer for health-related costs it incurred, Tennessee has no legal right to the funds. Thus, satisfaction of any award by the court would not require Tennessee to pay any proceeds to which it has "a present and settled interest." *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002). Although Tennessee may have some expectation of recouping healthcare costs from the escrow fund at some point, "[t]he difference between possible future earnings and present entitlement to future payment has been recognized as marking the line between prospective and retrospective relief." *Id.* at 951 (citing *Papasan v. Allain*, 478 U.S. 265, 281 (1986)).

This court's decision in *Rossborough Manufacturing Co. v. Trimble*, 301 F.3d 482 (6th Cir. 2002), is also instructive. The plaintiffs in that case were Ohio employers who had paid premiums into a state-administered supplemental workers' compensation fund. After the Ohio Supreme Court declared the fund unconstitutional, the employers sought reimbursement for payments they had made to the fund in order to settle lawsuits by several workers. Ohio's treasurer and its workers' compensation administrator denied the claims for reimbursement, and the employers sued. In

---

[4]The Attorney General did not list sovereign immunity among its affirmative defenses in its initial answer to the Plaintiffs' complaint in federal district court. The Attorney General raised the immunity defense in a motion to dismiss. That was sufficient to defeat any argument that the immunity issue had been waived. *Cf. Edelman*, 415 U.S. at 678 (explaining that a State can raise the immunity defense for the first time on appeal without waiving it).

response to the officials' Eleventh-Amendment argument, the court concluded that they were not immune:

> In the case at hand, the plaintiffs explicitly demand prospective injunctive relief and a declaratory judgment; implicitly, they seek reimbursement that the claim should be paid out of the Fund. While it may be argued that the explicit demand for injunctive relief and a declaratory judgment is merely a cover for the implicit request for money, we conclude that the *Ex Parte Young* exception applies. The plaintiffs challenge the constitutionality of the Treasurer's and Administrator's administration of the Fund. Were we to find that the actions of those officials are unconstitutional, and to issue an injunction preventing the continued unconstitutional administration of the Fund, the plaintiffs would not need a judgment against the state awarding them money damages because the injunction would lead to the lawful administration of the Fund and reimbursement for the plaintiffs. Accordingly, we hold that the Treasurer and Administrator are not entitled to Eleventh Amendment immunity.

*Id*. at 489. Similarly, were S&M Brands and ITP to prevail on the merits of their due-process claim, it could be argued that the judgment would not be one of damages, but rather injunctive relief because the judgment order would simply require, upon request by the manufacturers sometime in the future, that the Attorney General apply the Original ASR Provision to certain escrow payments made on cigarette sales in 2003 and 2004.

Ultimately, however, we conclude that jurisdiction does not lie in federal court. Several considerations factor into our decision. It is true, as explained above, that Tennessee has no current ownership interest in the Plaintiffs' escrow funds. In that sense, ordering the Attorney General to release funds from escrow would not be a retroactive monetary remedy like the one described in *Barton*.

In a different sense, though, the Plaintiffs are asking the federal court for relief for a past, one-time decision of the Attorney General that purportedly violated their federal constitutional rights. Whether the Attorney General's conduct is described as the breach of a "continuing obligation" to enforce the Escrow and Contraband Statutes or the "ongoing liability for past breach" of duty is immaterial; the Supreme Court has instructed courts to look to the substance of the legal claim, not its formal description. *Papasan*, 478 U.S. at 280 ("The distinction between a continuing obligation on the part of the trustee and an ongoing liability for past breach of trust is essentially a formal distinction of the sort [the Court] rejected in *Edelman*."); *cf. Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945) ("We have previously held that the nature of a suit as one against the state is to be determined by the essential nature and effect of the proceeding."), *overruled on other grounds by Lapides*, 535 U.S. at 623. In this case, the Plaintiffs filed requests for refunds and the Attorney General determined that the ASR Amendment applied to those requests. That was a one-time act that occurred in the past. The Plaintiffs' claim of retroactive application is unlikely to recur in the future. Indeed, recurrence would require the Tennessee General Assembly to pass another amendment changing the calculation of the refund. The Attorney General therefore is not continuing to apply the statute retroactively/unconstitutionally, which is what *Edelman* requires, he has only refused to pay.

The case law from both the Supreme Court and our court does not bar only retroactive monetary relief, but rather *all* retroactive relief. It is true that most suits seeking relief for past constitutional violations request monetary damages. As noted in *Quern*, however, "The distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on the one hand and retrospective relief on the other." 440 U.S. at 337. That was also the holding of *Pennhurst State School & Hospital v. Halderman*:

> We recognized [in *Edelman*] that the prospective relief authorized by [*Ex parte*] *Young* "has permitted the [Fourteenth Amendment] to serve as a sword, rather than merely a shield" . . . . But we declined to extend the fiction of [*Ex parte*] *Young* to encompass retroactive relief, for to do so would effectively eliminate the constitutional immunity of the States.

465 U.S. 89, 105 (1984) (internal citation omitted). Therefore, whether the requested relief would diminish a State's coffers was not (necessarily) relevant because "a federal court . . . may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." *Quern*, 440 U.S. at 337 (citing *Edelman*, 415 U.S. at 667-68). The alleged constitutional deficiency here is a one-time, past event; the Plaintiffs do not seek a prospective injunction that requires the Attorney General to conform his conduct in an ongoing, continuous fashion. *Cf. Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002) (explaining that courts should engage in a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," even though declaratory relief might impose some retrospective financial liability on a private party); *Holton v. Ind. Horse Racing Comm'n*, 398 F.3d 928, 929 (7th Cir. 2005) (explaining that the plaintiff "would encounter a problem [under sovereign immunity] had he asked the court to direct the Commission to *reverse* the stewards' decision and pay him $6,250 . . . but a request for review differs from a request for damages." (emphasis in original)). Rather, they seek a declaration that the Attorney General's prior determination was in error and had an impermissible retroactive effect, the correction of which, incidentally, would entitle them to monetary relief.

As for *Barton*, that case dealt with "an exception to the exception" to *Ex parte Young*. 293 F.3d at 949. That is, *Ex parte Young* held that state officers were subject to suit in federal court for violations of the federal Constitution. *Edelman* found that *Ex parte Young* did not apply to past violations, but only to prospective injunctive relief. *Edelman* noted that this line was often difficult to draw, and it found that a suit that required incidental expenditures of state funds in order to comply with an injunction did not violate the Eleventh Amendment. "The dividing line, therefore, is whether the money or the non-monetary injunction is the primary thrust of the suit." *Id*. That is, *Barton* did not address whether monetary relief, to which the State had a "present and settled interest," was a necessary prerequisite to Eleventh Amendment immunity. Rather, it determined that when it is unclear whether prospective or retrospective relief is requested—i.e. whether "money or the non-monetary injunction is the primary thrust of the suit"—then the court should proceed to a determination of whether the State's interest was present and settled or contingent and future.

Here, there is no question that money is "the primary thrust of the suit." There is no constitutional defect that will be remedied by compliance with an order of the court other than the failure to make a one-time payment of money.

While some factual similarities exist between *Rossborough* and the present case, it is ultimately distinguishable. *Rossborough* challenged, at heart, the ongoing administration of the fund monies. It argued that the dissolution of the fund would result in an injury in every subsequent case where an employer sought reimbursement for tortious liability. These violations would occur continuously in the future. Indeed, as the *Rossborough* court noted, "suits demanding retroactive relief, such as requests for money that should have been paid, do not fall under the *Ex Parte Young* exception." 301 F.3d at 489 (citing *Edelman*, 415 U.S. at 664). The injunction sought in *Rossborough* did not simply demand money that should have been paid at one time in the past, but rather would require that the fund be constitutionally administered for all additional requests for reimbursement by any claimant in the future.

The dissent cites *Verizon Maryland* in support of its position that the Plaintiffs are seeking only prospective relief. The circumstances in that case, however, were demonstrably different than those presented here. Verizon Maryland Inc. and MFS Intelenet of Maryland (later acquired by WorldCom) had entered into an interconnection agreement, as provided for under the Telecommunications Act of 1996. *Verizon Md.*, 535 U.S. at 639. The Maryland Public Service Commission approved the agreement. *Id.* Sometime later, Verizon Maryland notified WorldCom that it would no longer pay reciprocal compensation for calls made through internet service providers. *Id.* WorldCom filed a complaint with the commission. The commission found in favor of WorldCom and ordered Verizon Maryland to pay "all future interconnection payments" owed to WorldCom as well as "any reciprocal compensation" that Verizon Maryland had withheld during the pendency of the dispute. *Id.* The commission reaffirmed Verizon Maryland's duty to pay in a subsequent administrative action filed by the company. *Id.* at 640. Verizon Maryland sued in federal court, seeking injunctive and declaratory relief. *Id.* The Fourth Circuit held that the *Ex parte Young* exception did not permit suit against the commissioners in their official capacities. *Id.*

The Supreme Court vacated the Fourth Circuit's decision. As to whether the *Ex parte Young* exception applied, the Supreme Court concluded that it did. It found that the injunctive relief sought by Verizon Maryland—"that state officials be restrained from enforcing an order in contravention of controlling federal law"—was clearly prospective in nature. *Id.* at 645. And, although the declaratory relief requested would necessary involve a question of past as well as future unlawful activity, any favorable declaration would not expose Maryland to any past liability. *Id.* at 646.

Unlike in *Verizon Maryland*, the Plaintiffs here do not argue that the Attorney General violates federal due process by applying the ASR Amendment to sales made today or in the future. Rather, the substance of their claim is completely focused on the past—a *past* decision of the Attorney General on *past* sales of cigarettes which had an impermissible retroactive (*past*) effect.

The inherent dignity interest of the sovereign States further counsels in favor of immunity in this case. The Supreme Court has instructed courts that the scope of sovereign immunity is not limited to the preservation of the treasury: "[I]t also serves to avoid 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). "[T]he sovereign immunity doctrine is about money *and* dignity–it not only protects a State's treasury, but also 'pervasively . . . emphasizes the integrity retained by each State in our federal system.'" *S.J.*, 374 F.3d at 421 (emphasis in original) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994)); *see also Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) (explaining that a State has a dignity interest as a sovereign in not being brought into federal court).

Finally, courts have long recognized that States enjoy immunity from suit in federal court for tax-related claims. As the Supreme Court explained in *Great Northern Life Insurance Co. v. Read*,

> Federal courts, sitting within states, are for many purposes courts of that state, but when we are dealing with the sovereign exemption from judicial interference in the vital field of financial administration a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found.

322 U.S. 47, 54 (1944) (internal citation omitted); *see also Reich v. Collins*, 513 U.S. 106, 110 (1994) ("We should note that the sovereign immunity States enjoy in *federal* court, under the Eleventh Amendment, does generally bar tax refund claims from being brought in that forum." (emphasis in original)). A State's sovereign immunity from suit in federal court does not, however,

leave a plaintiff without any judicial redress. "[T]he Constitution mandates the availability of effective remedies . . . for the coercive collection of taxes, and accordingly requires [State] courts to provide those remedies, the sovereign immunity States traditionally enjoy in their own courts notwithstanding." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 527 (6th Cir. 2004) (citation omitted).

The Plaintiffs' escrow claim closely resembles a claim that a state tax commissioner violated federal due process by improperly calculating a corporation's tax liability by retroactively applying a new tax statute to past taxable activity. It is clear that a State would be immune in federal court from the latter claim, but what about the former?

Several factors support treating the Plaintiffs' escrow claim as analogous to a tax claim for immunity purposes. First, while not determinative, the Plaintiffs themselves consider the escrow-payments as a "discriminatory" tax. Appellees' Br. at 31.[5] In fact, like any typical state sales tax, the escrow payments are calculated on the number of units (cigarettes) sold in the state (although the amount of any refund is not strictly tied to the quantity sold). At the time of sale, the amount of the cigarette's price designated to be placed in escrow is indistinguishable from a sales tax. If a manufacturer fails to make what Tennessee officials deem to be the correct escrow payment, the tax stamps will be removed from that manufacturer's cigarettes and the manufacturer will be removed from the list of manufacturers that can sell in the state. Thus, it is clear that from a manufacturer's viewpoint, the escrow payments are simply a type of business tax.

From the State's viewpoint, it also treats the escrow-payment system as a quasi-tax. As noted above, Tennessee calculates the escrow payments like a per-unit tax. Additionally, Tennessee regulates the escrow-payment system in part as a tax and license program. Specifically, the relevant statutes are found in two complementary chapters of the Tennessee Code, Title 47, Commercial Instruments and Transactions, and Title 67, Taxes and Licenses. Both the State's Attorney General and its Commissioner of taxation have concurrent and complementary responsibilities to enforce the Escrow and Contraband Statutes. An NPM, for instance, must certify compliance with the escrow requirements to both the Attorney General and the Commissioner. Tenn. Code § 67-4-2602(a). The Commissioner maintains the directory of all manufacturers that have provided conforming certifications. *Id.* § 67-4-2602(b). The Commissioner can require a manufacturer "to submit any additional information . . . to determine whether a tobacco product manufacturer is in compliance with" the escrow requirements. *Id.* § 67-4-2604(d). The Commissioner also has the authority to promulgate regulations "to effect the purposes" of the Escrow and Contraband Statutes. *Id.* § 67-4-2606(d). Finally, the Commissioner has the authority to suspend or revoke the license of the manufacturer's licensed agent as well as to impose civil penalties for violations. *Id.* § 67-4-2605(a). All of these powers and duties of the Commissioner correspond to similar ones granted to that officer under Tennessee's other tax and license laws.

We recognize, of course, that the escrow payment is unlike a traditional tax or license fee in that the payments do not become part of Tennessee's general treasury immediately upon deposit. However, Tennessee regulates the escrow payments in large measure as if the payments were a tax

---

[5]*See also* Appellees' Br. at 31 ("The ASR [Amendment] is akin to a sales tax, albeit a discriminatory one . . . . No court to the best of our knowledge has ever applied a sales tax to sales made before its enactment, and *a fortiori*, a discriminatory one . . . ."); Appellees' Reply Br. at 3 ("The escrow fund payments are equivalent to sales taxes on specified articles regardless of price . . . ."); *id.* at 7 ("[T]he prejudice suffered by S&M [Brands] from the retroactive application of this *quasi* sales tax cannot be gainsaid."); *id.* at 10 ("The District Court simply failed to appreciate that these escrow fund payments are the equivalent of sales taxes . . . .").

or license fee. The escrow payments do have an impact, however conjectural, on the "vital field of financial administration" of the State. *Ford Motor*, 323 U.S. at 465.[6]

Accordingly, given the retroactive nature of the Plaintiffs' due-process claim and requested relief, Tennessee's dignity interest as a sovereign government in our federal republic, and the quasi-tax nature and treatment of the escrow payments, we hold that the Plaintiffs' claim is barred in federal court by sovereign immunity. Like similar cases which raise federal constitutional questions, the Plaintiffs will have to seek redress (if they wish) in state court for their due-process claim. *See Reich*, 513 U.S. at 109-10 ("[A] denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention of the Fourteenth Amendment, the sovereign immunity States traditionally enjoy in their own courts notwithstanding." (internal quotation marks and citation omitted)); *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 102 (1993) ("State law may provide relief beyond the demands of federal due process, but under no circumstances may it confine petitioners to a lesser remedy." (internal citations omitted)); *DLX*, 381 F.3d at 528 ("Thus, where the Constitution requires a particular remedy, such as through the Due Process Clause for the tax monies at issue in *Reich*, . . . the state is required to provide that remedy in its own courts, notwithstanding sovereign immunity."); *cf. Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) ("[S]tate courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States."). Accordingly, we do not reach the merits of the Plaintiffs federal due-process claim.[7]

## IV

For the reasons set forth above, we **REVERSE** the district court's grant of partial summary judgment to each party on the Plaintiffs' due-process claim and **REMAND** with instructions to dismiss the claim without prejudice as barred in federal court by sovereign immunity.

---

[6]To be clear, we do not conclude that the escrow payment is, in fact, a tax, but rather that it is analogous to one for sovereign-immunity purposes.

[7]The dissent laments that we are in a "rush to avoid addressing the complex substantive questions that this case raises" and are "too quick to invoke Tennessee's sovereign immunity." Dis. op. at 12. It is arguable whether sovereign immunity or the Plaintiffs' due-process claim raises the more complex issues. In any event, ours is a rush to judgment as Odysseus's was a brief sally around the Ionian Islands.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. I believe that the majority, in its rush to avoid addressing the complex substantive questions that this case raises, is too quick to invoke Tennessee's sovereign immunity as a bar to this suit. The majority claims that S&M Brands and ITP seek redress for a "one-time act that occurred in the past." Maj. Op. at 7. Thus, the majority claims that the injunction that the plaintiffs-appellees seek is not for prospective relief but "[r]ather, they seek a declaration that the Attorney General's prior determination was in error and had an impermissible retroactive effect, the correction of which, incidentally, would entitle them to monetary relief." Maj. Op. at 8. Because state sovereign immunity would bar retroactive relief, by framing the plaintiffs' prayer for relief as retroactive and not prospective, the majority has quickly circumscribed the plaintiffs' case. I conclude, however, that both Supreme Court and our own precedent make it clear that S&M Brands and ITP seek only prospective relief. Because the relief that the plaintiffs seek is not of the kind barred by sovereign immunity, I must disagree with the majority's application of the doctrine of sovereign immunity.

Although the Eleventh Amendment protects states from suits brought by citizens, the Supreme Court recognized an exception to that protection in *Ex parte Young*, 209 U.S. 123 (1908). In that case, the Court held that "[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id*. at 159-60. According to the *Ex parte Young* Court, the official whose actions would violate the constitution "may be enjoined by a Federal court of equity from such action" despite claims of sovereign immunity. *Id.* at 155-56.

S&M Brands and ITP assert that the *Ex parte Young* exception to the Eleventh Amendment allows their suit against Tennessee to proceed over sovereign-immunity objections. Not all forms of requested relief, however, trigger the *Ex parte Young* exception. The Supreme Court, in *Edelman v. Jordan*, 415 U.S. 651, 668 (1974), limited the *Ex parte Young* exception to prospective injunctive relief and declined to interpret the exception "to encompass retroactive relief, for to do so would effectively eliminate the constitutional immunity of the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).

Thus, the majority in the instant case is correct when it states that "'[t]he distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on the one hand and retrospective relief on the other.'" Maj. Op. at 7-8 (quoting *Quern v. Jordan*, 440 U.S. 332, 337 (1979)). Where the majority errs, however, is in its understanding of retrospective relief. *Edelman* was a damages action where potential recipients of assistance from the Illinois Aid to the Aged, Blind, or Disabled program sought "a form of compensation to those whose applications were processed on the slower time schedule." *Edelman*, 415 U.S. at 668. What the plaintiffs were seeking in *Edelman* was a "reparation for the past," *id.* at 665, which would be "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials," *id.* at 668. The retroactive award that so concerned the *Edelman* Court was compensation intended to repair harm caused by past acts. Such an award is nothing like the one sought in the case before us.

The instant case is much closer in fact and law to *Rossborough Manufacturing Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002), than it is to *Edelman*. *Rossborough* dealt with the Ohio Legislature's dissolution of the state's Intentional Tort Disbursement Fund following the Ohio

Supreme Court's holding that the fund violated the Ohio Constitution.  Following an explosion at one of its factories, an injured employee and the estates of two dead employees of Rossborough sued the company for damages.  Prior to the Ohio Supreme Court's and Senate's actions, the fund, into which employers were required to pay, would have covered the employees' suit, prompting Rossborough to seek an injunction requiring payment of the employees' claims from the fund.

Although we ultimately held for the state of Ohio on other grounds in *Rossborough*, we also held that the state could not assert sovereign immunity:

> Were we to find that the actions of those officials are unconstitutional, and to issue an injunction preventing the continued unconstitutional administration of the Fund, the plaintiffs would not need a judgment against the state awarding them money damages because the injunction would lead to the lawful administration of the Fund and reimbursement for the plaintiffs.  Accordingly, we hold that the Treasurer and Administrator are not entitled to Eleventh Amendment immunity.

*Id.* at 489.  I believe that *Rossborough* controls our decision in the instant case, and we should hold that sovereign immunity does not protect Tennessee.  The majority, however, distinguishes *Rossborough* by claiming that "[t]he injunction sought in *Rossborough* did not simply demand money that should have been paid at one time in the past, but rather would require that the fund be constitutionally administered for all additional requests for reimbursement by any claimant in the future."  Maj. Op. at 8-9.

The majority's attempt to distinguish these cases, in my view, fails.  In both *Rossborough* and the instant case, the companies paid into state-run funds as required by law.  In both *Rossborough* and the instant case, the companies allege that the unconstitutional administration of the funds is preventing the companies from gaining access to the monies held in the funds.  And in both *Rossborough* and the instant case, the companies seek an injunction that would force the state to administer the fund in a constitutional manner.  Although it is true that in both cases the effect of the injunction would ultimately transfer money from the state for the benefit of those opposing sovereign immunity, in *Rossborough* we did not hold that such a gain was retrospective compensation in the mode of *Edelman*, and such a gain would be no more retrospective in the instant case.

The Supreme Court's holding in *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), makes clear the majority's error in classifying *Rossborough* as prospective but the instant case as retroactive.  In *Verizon Maryland*, the Court held that sovereign immunity did not bar Verizon's suit seeking injunctive relief that would stop the Maryland Public Service Commission's order that Verizon pay WorldCom reciprocal compensation.  "The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our 'straightforward inquiry [into whether the relief is prospective].'"  *Id.* at 645 (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).  In that case, the injunction did not impose ever-lasting obligations, which the majority today seems to believe are required, *see* Maj. Op. at 9 (claiming that *Rossborough*'s holding was prospective only because it "require[d] that the fund be constitutionally administered *for all additional requests for reimbursement by any claimant in the future*" (emphasis added)), but instead the injunction sought in *Verizon Maryland* simply enjoined future application of an unconstitutional rule.  The plaintiffs here ask for no more than Verizon:  an injunction that would bar the Tennessee Attorney General from applying his allegedly unconstitutional decision.  I, therefore, disagree with the majority's assertion that "the substance of [S&M's] claim is completely focused on the past."  Maj. Op. at 9.  This case is about whether the Tennessee Attorney General may *continue* to enforce a rule in violation of federal law; this case presents no more of an issue involving a "one-time act that occurred in the past," Maj. Op. at 7, than *Verizon Maryland*.  In both cases, the question before

the court is whether the agent of the state may continue to act in defiance of the law, and whether that has a monetary effect upon the state is irrelevant. Thus, S&M Brands and ITP seek prospective relief, and to hold otherwise is to go against clear precedent.

In reading the majority's opinion, it seems to me that the majority is concerned that the injunction S&M Brands and ITP seek would not apply to "any claimant in the future," Maj. Op. at 9, because the class of Non-Participating Manufacturers ("NPMs") who filed their refund claims for 2003 cigarette sales after April 20, 2004, or who seek to have the original Allocable Share Release provision applied to sales between January 1 and April 19, 2004, is fixed and presumably small. According to the majority's logic, an injunction would be prospective only if the Attorney General would make similar rulings against NPMs in the future, and that "would require the Tennessee General Assembly to pass another amendment changing the calculation of the refund." Maj. Op. at 7. However, the majority is mistaken when it focuses on the repeatability of the Attorney General's mistake. The Attorney General of Tennessee need not be in a position to make his mistake over and over before an injunction constitutes appropriate prospective relief, just as the Maryland Public Service Commission need not be prepared continually to rule against Verizon before an injunction becomes necessary, and just as Rossborough need not be in a position to be sued again. In all three cases, including the case at hand, the injunction was requested to prevent a future unconstitutional act.

"As in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman*, 415 U.S. at 667. In this case, however, our precedent, as well as that of the Supreme Court, makes it clear that the relief requested is prospective relief that would come within the exception to sovereign immunity in *Ex parte Young*. For that reason, I dissent. Because the majority did not reach the merits of the case, I decline to do so as well.

I believe the majority in this case errs when it concludes that the plaintiffs seek retrospective relief. Because I believe that the plaintiffs seek relief that is consistent with the Supreme Court's exceptions to the doctrine of sovereign immunity, I would hold that sovereign immunity does not bar this suit. Therefore, I respectfully dissent.