RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0167p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

**16-1684**

BEATRICE BOLER; EDWIN ANDERSON; ALLINA ANDERSON; EPCO SALES, LLC,

*Plaintiffs-Appellants*,

*v.*

DARNELL EARLEY; GERALD AMBROSE; DAYNE WALLING; CITY OF FLINT; STATE OF MICHIGAN; MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY; MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES; RICHARD DALE SNYDER,

*Defendants-Appellees*.

Nos. 16-1684/17-1144

**17-1144**

MELISSA MAYS; MICHAEL MAYS; JACQUELINE PEMBERTON; KEITH JOHN PEMBERTON; ELNORA CARTHAN; RHONDA KELSO,

*Plaintiffs-Appellants*,

*v.*

RICK SNYDER; STATE OF MICHIGAN; DANIEL WYANT; LIANE SHEKTER SMITH; ADAM ROSENTHAL; STEPHEN BUSCH; PATRICK COOK; MICHAEL PRYSBY; BRADLEY WURFEL; DARNELL EARLEY; GERALD AMBROSE; DAYNE WALLING; HOWARD CROFT; MICHAEL GLASGOW; DAUGHERTY JOHNSON; CITY OF FLINT; NICK LYON; ANDY DILLON; EDWARD KURTZ; JEFF WRIGHT,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
Nos. 5:16-cv-10323; 5:15-cv-14002—John Corbett O'Meara, District Judge.

Argued: June 15, 2017

Decided and Filed: July 28, 2017

Before: COLE, Chief Judge; STRANCH and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED: 16-1684**: Nicholas A. Szokoly, MURPHY, FALCON & MURPHY, Baltimore, Maryland, for Appellants. William Y. Kim, CITY OF FLINT, Flint, Michigan, for Flint Appellees. Margaret Bettenhausen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State Appellees. **17-1144:** Samuel R. Bagenstos, Ann Arbor, Michigan, for Appellants. Margaret A. Bettenhausen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees State of Michigan, Snyder, Lyon, and Dillon. William Y. Kim, CITY OF FLINT, Flint, Michigan, for Flint Appellees. **ON BRIEF: 16-1684**: Nicholas A. Szokoly, Jason G. Downs, Jessica H. Meeder, MURPHY, FALCON & MURPHY, Baltimore, Maryland, for Appellants. William Y. Kim, CITY OF FLINT, Flint, Michigan, Frederick A. Berg, Jr., Sheldon H. Klein, BUTZEL LONG, P.C., Detroit, Michigan, for Flint Appellees. Margaret Bettenhausen, Richard S. Kuhl, Nathan A Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Eugene Driker, Morley Witus, Todd R. Mendel, BARRIS, SOTT, DENN & DRIKER, PLLC, Detroit, Michigan, for State Appellees. Samuel R. Bagenstos, Ann Arbor, Michigan, for Amicus Curiae. **17-1144:** Samuel R. Bagenstos, Ann Arbor, Michigan, Michael L. Pitt, Cary S. McGehee, Beth M. Rivers, PITT MCGEHEE PALMER & RIVERS, PC, Royal Oak, Michigan, Paul F. Novak, Gregory Stamatopolous, Diana Gjonaj, WEITZ & LUXENBERG, PC, Detroit, Michigan, William H. Goodman, Julie H. Hurwitz, GOODMAN & HURWITZ, PC, Detroit, Michigan, Deborah A. LaBelle, LAW OFFICE OF DEBORAH A. LABELLE, Ann Arbor, Michigan, for Appellants. Margaret A. Bettenhausen, Richard S. Kuhl, Nathan A. Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees State of Michigan, Snyder, Lyon, and Dillon. William Y. Kim, CITY OF FLINT, Flint, Michigan, Frederick A. Berg, Jr., Sheldon H. Klein, BUTZEL LONG, P.C., Detroit, Michigan, Todd R. Perkins, Nikkiya Branch, THE PERKINS LAW GROUP PLLC, Detroit, Michigan, Alexander S. Rusek, WHITE LAW PLLC, Okemos, Michigan, EDWARD A. ZEINEH, DAVID W. MEYERS, LAW OFFICE OF EDWARD A. ZEINEH, Lansing, Michigan, Barry A. Wolf, LAW OFFICE OF BARRY A. WOLF PLLC, Flint, Michigan, BRETT T. MEYER, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Flint Appellees. Michael J. Pattwell, Jay M. Berger, Christopher B. Clare, CLARK HILL PLC, Detroit, Michigan, Thaddeus E. Morgan, FRASER TREBILCOCK, Lansing, Michigan, Charles E. Barbieri, Allison M. Collins, FOSTER, SWIFT, COLLINS & SMITH, Lansing, Michigan, Phillip A. Grashoff, Jr., Dennis K. Egan, Krista A. Jackson, KOTZ SANGSTER WYSOCKI, Bloomfield Hills, Michigan, for Appellees Busch, Cook, Prysby, Rosenthal, Smith, Wurfel, and Wyant. Gregory M. Meihn, FOLEY & MANSFIELD, P.L.L.P., Ferndale, Michigan, Joseph F. Galvin, GENESEE COUNTY DRAIN COMMISSION, Flint, Michigan, for Appellee Wright. Sarah C. Tallman, NATURAL RESOURCES DEFENSE COUNCIL, Chicago, Illinois, Dimple Chaudhary, NATURAL RESOURCES DEFENSE COUNCIL, Washington, D.C., Michael J. Steinberg, Bonsitu A. Kitaba, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Amicus Curiae.

---------------

**OPINION**

---------------

JANE B. STRANCH, Circuit Judge.  These two cases arise from the water contamination crisis in Flint, Michigan.  Plaintiffs, residents of Flint affected by the contaminated city water, bring suit against various state and local officials and entities, alleging violation of their constitutional rights, pursuant to 42 U.S.C. § 1983, along with other claims.  In *Boler*, the district court determined that the § 1983 claims were preempted by the Safe Drinking Water Act (SDWA) and dismissed the case for lack of subject matter jurisdiction.  Relying on its preemption analysis in *Boler*, the court dismissed the *Mays* case.  The cases have been consolidated on appeal.  For the reasons explained below, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.

## I.  BACKGROUND

### A.  Factual Background

In March 2011, the Michigan state Legislature passed the Local Government and School District Fiscal Accountability Act ("Act 4"), which authorized the governor to appoint an emergency manager for certain local governments.  Act 4 replaced an earlier Michigan law, the Local Government Fiscal Responsibility Act ("Act 72"), which had been in effect since 1990.  Act 72 gave the State power to appoint an emergency financial manager to municipalities facing financial crises.  Act 4 expanded the scope of the powers granted to these emergency financial managers and changed their title to simply "emergency managers."  New emergency managers were subsequently appointed in several areas; in August 2012, Governor Rick Snyder appointed Edward Kurtz in Flint.

On November 5, 2012, Michigan voters rejected Act 4 by referendum.  This revived Act 72.  *See* Mich. Op. Att'y Gen. No. 7267, 2012 WL 3544658, at *6 (Aug. 6, 2012).  In December, the Michigan Legislature responded by enacting the Local Financial Stability and Choice Act ("Act 436"), effective March 28, 2013.  Under Michigan law, a public act with an appropriations provision is not subject to referendum.  *See In re City of Detroit*, 504 B.R. 191, 252 (Bankr. E.D.

Mich. 2013) (citing *Mich. United Conservation Clubs v. Sec'y of State*, 464 Mich. 359, 367 (2001)).  Unlike Act 4, Act 436 added appropriations provisions that prevented voters from subjecting it to a referendum. *Id.* at 251.  Act 436, like Act 4, authorized the State to appoint emergency managers with authority to exercise the power of local governments. *See Phillips v. Snyder*, 836 F.3d 707, 711 (6th Cir. 2016).

Following the passage of Act 436, Kurtz resumed his status as named Emergency Manager for the City of Flint, and remained in that post until July 2013.  In November 2013, Governor Snyder appointed Darnell Earley as Emergency Manager for the City of Flint.  In January 2015, Earley was replaced by Gerald Ambrose.

Between 1967 and 2014, the City of Flint sourced its water from Lake Huron via the Detroit Water and Sewerage Department (DWSD).  On March 29, 2013, one day after Act 436 went into effect, the City of Flint decided to join a water supplier, the Karegnondi Water Authority (KWA), that was to be established.  Sourcing water for Flint had been under review.  In 2011, Flint had commissioned a study ("2011 Report" or "Report") to evaluate the cost of treating water from the Flint River for municipal use as an alternative to either purchasing from the future KWA or continuing its existing contract with DWSD.  The Report determined that water from the Flint River would need to be treated to meet current water safety regulations.  It also concluded that the cost of treating water from the Flint River to provide safe municipal use would be greater than the proposed KWA contract, but less than continuing the contract with DWSD.  The officials thus decided to go with the cheapest long-term option—the KWA.

Shortly after the decision to switch to the KWA was made, DWSD notified Flint that its current contract would terminate in approximately one year, in April 2014.  Because the KWA would take several years to construct, officials were tasked with choosing an interim water source: the Flint River or DWSD.  Officials chose the Flint River.  Genesee County, which includes Flint but is, according to the Defendants, "[j]urisdictionally separate and distinct from the City of Flint," had also decided to switch its future water supply to the KWA.  Unlike the City of Flint, Genesee County officials opted to continue to purchase DWSD water during the KWA's construction.  The Defendants state that this was because Genesee County, unlike Flint, does not have its own water treatment plant.

In April 2014, Flint's emergency manager changed the source of the city's water from DWSD to the Flint River. The plaintiffs assert that at this time, the City knew "that the Flint River could not be a source of safe municipal water unless it underwent significant treatment, including the addition of anti-corrosive agents and treatment for microbial contaminants," as explained by the 2011 Report. The Report itself states that its comparison to other alternatives "assumed that the Flint [water treatment plant] w[ould] treat water from the river to provide a finished water of similar quality to other alternatives being considered." There is no evidence that the City upgraded the treatment plants or provided for additional safety measures prior to switching water supply sources on April 25, 2014. The Defendants contend that they operated in accordance with the SDWA's Lead and Copper Rule, which requires a two-step process that begins with "initial monitoring" over two separate six-month periods to determine if treatment is required. The first six-month period did not begin until June 2014.

Following the switch to the Flint River, residents immediately began to complain that the drinking water "smelled rotten, looked foul, and tasted terrible." Larger problems with the water supply soon became apparent. Testing conducted in August and September 2014 detected coliform and *E. coli* bacteria in the water supply. In October 2014, the water was linked to Legionnaire's disease. General Motors discontinued its water service because the Flint River water was corroding its parts.

In January 2015, the City issued a notice that the drinking water violated standards, but that it was safe to drink. In February 2015, further water testing indicated high levels of contaminants such as lead and total trihalomethane. The Defendants state that the City conducted its two required rounds of sampling to determine lead levels, from July to December 2014 and January to June 2015, but the results did not exceed the SDWA Lead and Copper Rule's "action level." The results did indicate that corrosion control treatment measures were needed to counteract lead levels, which "had risen since switching to the Flint River." In March 2015, the Flint City Council voted to reconnect with DWSD rather than continuing to use the Flint River water supply, but the City government's vote was overruled by the Emergency Manager.

Over the next few months, the City issued instructions to residents on their use of water, including advising them to "pre-flush" taps prior to use or to stop drinking the water altogether. In June 2015, the EPA warned of high lead levels in the water. In response, officials provided consumers with water filters, which the Plaintiffs state did not substantially improve the water quality and were incapable of filtering out known contaminants.

In October 2015, Genesee County declared a public health emergency in Flint, advising residents not to drink the water. That same month, the Emergency Manager ordered that Flint reconnect to DWSD. By that point, however, the protective coating in the water supply pipes had been damaged by water from the Flint River, and until the coating could "buil[d] up to appropriate levels," the water would continue to have elevated lead levels. The EPA issued an advisory to Flint residents in February 2016, warning them that unfiltered water was not safe and advising the use of bottled water, especially for young children and pregnant women. Many of these advisories are currently still in place, and Flint remains in a state of emergency.

Flint residents have been billed continuously for their water services since April 2014. The City of Flint has engaged in collection efforts when payments have not been made, including disconnecting water service altogether and issuing liens against real property. The Defendants state that Michigan is providing funds for the reimbursement of water bills, as well as making other efforts to ameliorate the effects of the water crisis.

On January 25, 2016, the Michigan Civil Rights Commission passed a resolution to hold a series of hearings to determine the impact of the Flint water contamination crisis on the civil rights of Michigan's citizens. The Commission, appointed by the Governor, held three hearings that included "expert testimony focusing on the history of Flint's economy and housing, environmental justice, and the application of the . . . emergency manager law." Michigan Civil Rights Commission, *The Flint Water Crisis: Systemic Racism Through the Lens of Flint* iii (Feb. 17, 2017). The Commission's 130-page report determined that the response to the Flint water crisis was "the result of systemic racism," *Id.* at 2., and that its finding was "based on a plethora of events and policies that so racialized the structure of public policy that it systemically produced racially disparate outcomes adversely affecting a community that is primarily made up of people of color." *Id.* at 6.

**B.  Procedural History of *Boler v. Earley***

Plaintiffs Beatrice Boler, Pastor Edwin Anderson and Mrs. Alline Anderson, and EPC Sales, LLC, a Flint business, brought a class action on behalf of purchasers of Flint water.  They brought suit against Darnell Earley and Gerald Ambrose, both former emergency managers of Flint; Dayne Walling, the former mayor of Flint; the City of Flint; Governor Rick Snyder; the State of Michigan; the Michigan Department of Environmental Quality (MDEQ); and the Michigan Department of Health and Human Services (MDHHS).

The Plaintiffs filed suit in the Eastern District of Michigan on January 31, 2016, alleging twelve causes of action, five of them pursuant to 42 U.S.C. § 1983: (1) impairment of the constitutional right to contract; (2) deprivation of substantive and procedural due process; (3) breach of the duty to protect against state-created danger; (4) breach of the Equal Protection Clause; and (5) deprivation of property interest without due process or just compensation.  The Plaintiffs also alleged claims for (6) conspiracy to deprive them of a constitutional right in violation of 42 U.S.C. § 1985; (7) breach of contract; (8) unjust enrichment; (9) breach of implied warranty of merchantability; (10) violation of the Michigan Consumer Protection Act, M.C.L. § 445.903; (11) conversion; and (12) gross negligence.

The Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin the defendants from billing and collecting money from Flint residents for water.  At a status conference following briefing on the preliminary injunction, the district court asked the parties to provide supplemental briefing on whether the court had jurisdiction over the case.  The court subsequently dismissed the case for lack of subject matter jurisdiction, finding that the Plaintiffs' § 1983 claims were precluded by the SDWA, leaving only state law claims over which the court did not have jurisdiction.  The district court did not address the Plaintiffs' claim under 42 U.S.C. § 1985, but presumably found it similarly preempted by the SDWA.  This appeal followed.

**C.  Procedural History of *Mays v. Snyder***

On November 13, 2015, Plaintiffs Melisa Mays, individually and as next friend of three minor children, Michael Mays, Jacqueline and Keith John Pemberton, Elnora Carthan, and Rhonda Kelso, individually and as next friend of one minor child, filed suit on behalf of a

proposed class of Flint residents or regular users of Flint water since April 25, 2014. They sued several defendants: Governor Snyder; former Michigan Treasurer Andy Dillon; Director of MDHHS Nick Lyon; former director of MDEQ Daniel Wyant and six former MDEQ officials[1]; Genesee County Drain Commissioner Jeff Wright; former Flint Emergency Managers Edward Kurtz, Darnell Earley, and Gerald Ambrose; former Flint Mayor Dayne Walling and three former Flint city officials[2]; the State of Michigan; and the City of Flint.

The Plaintiffs filed an Amended Complaint on May 25, 2016. It alleged six causes of action, four of them under 42 U.S.C. § 1983: (1) violation of substantive due process through state-created danger; (2) violation of substantive due process through an invasion of the fundamental right to bodily integrity; (3) intentional race discrimination in violation of the Equal Protect Clause; and (4) impermissible wealth-based discrimination in violation of the Equal Protection Clause. The Plaintiffs also asserted that the Defendants (5) engaged in a racially-motivated conspiracy to deny equal protection under 42 U.S.C. § 1985, and (6) engaged in discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2302.

Relying on its finding of preclusion by the SDWA in *Boler*, the district court dismissed the *Mays* Plaintiffs' § 1983 claims for lack of subject matter jurisdiction under Rule 12(b)(1).[3] The court also determined that without the § 1983 claims, Plaintiffs' § 1985 claim "based upon

---

[1]These officials, who are sued in their individual capacity, are: Liane Shekter Smith, Chief of the Office of Drinking Water and Municipal Assistance for MDEQ; Adam Rosenthal, a Water Quality Analyst assigned to MDEQ's Lansing District Office; Stephen Busch, District Supervisor for MDEQ's Lansing District Office; Patrick Cook, a Water Treatment Specialist assigned to MDEQ's Lansing Community Drinking Water Unit; Michael Prysby, an engineer assigned to District 11 (Genesee County) of MDEQ; and Bradley Wurfel, Director of Communications for MDEQ.

[2]These former City of Flint officials are: Howard Croft, Director of Public Works; and Michael Glasgow and Daugherty Johnson, both Utilities Administrators.

[3]In *Mays*, the district court dismissed the claims pursuant to motions under both 12(b)(1) and (6) but specifically referred to its disposition of *Boler*. The *Mays* Defendants continue to treat this issue as one of jurisdiction. The Plaintiffs note that whether their § 1983 claims are preempted by the SDWA is probably a merits, not jurisdictional, issue because it goes to the availability of a cause of action rather than the court's power to adjudicate a case. Similar cases examining like questions of preemption have arisen as motions to dismiss under Rule 12(b)(6) or for summary judgment. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 249 (2009) (district court dismissed § 1983 claims based on Rule 12(b)(6)); *Mattoon v. City of Pittsfield*, 980 F.2d 1, 2 (1st Cir. 1992) (district court granted summary judgment to defendants on § 1983 claims). We have not found other comparable cases using a Rule 12(b)(1) motion to address statutory preemption of § 1983 claims; it appears that the district court incorrectly addressed this issue as jurisdictional. We nonetheless examine the underlying question of preemption.

the same conduct" also failed.  Having dismissed the federal claims, the court declined to exercise supplemental jurisdiction over the state law discrimination claim.  Plaintiffs appealed, and their case was consolidated with *Boler*.

## II. ANALYSIS

We "appl[y] a de novo standard when reviewing the district court's determination of jurisdiction."  *Dealer Computer Servs. Inc. v. Dub Herring Ford*, 547 F.3d 558, 560 (6th Cir. 2008).  Likewise, we review questions of constitutional and statutory interpretations de novo.  *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006).

### A.  Preclusion of § 1983 Claims by the Safe Drinking Water Act

The district court's SDWA preemption analysis drew from *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 21 (1981), in which the Supreme Court found that the § 1983 claims presented were preempted by the statutes alleged.  The court primarily relied on the First Circuit's determination that the SDWA foreclosed other federal remedies for an alleged right to "safe and potable water." *Mattoon v. Pittsfield*, 980 F.2d 1, 4–6 (1st Cir. 1992).  The Plaintiffs argue that this is not the proper focus of their claims, and more importantly, that the district court misapplied the standard enunciated by the Supreme Court in its line of cases that began with *Sea Clammers* and concluded with *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 252 (2009).

The provisions of 42 U.S.C. § 1983 may serve as a vehicle for a plaintiff to obtain damages for violations of the Constitution or a federal statute.  Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

In *Sea Clammers*, the Court examined claims—brought under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251, and the Marine Protection, Research, and Sanctuaries Act (MPRSA), 33 U.S.C. § 1401, as well as under § 1983—alleging violations of

those statutes as a result of damage to fishing grounds from pollution.  453 U.S. at 4–5. Focusing on Congress's intent in enacting FWPCA and MPRSA and finding that they provide "unusually elaborate enforcement mechanisms," the Court held that the plaintiffs could not use § 1983 to enforce their rights under those pollution statutes.  *Id.* at 13.  The Court compared § 1983 to FWPCA and MPRSA, primarily examining the extensiveness of the remedial scheme and its relationship to congressional intent: "[w]hen the remedial devices provided in the particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983."  *Id.* at 20.  Based on these statutory provisions, the Court found it "hard to believe that Congress intended to preserve the § 1983 right of action" for violations of the statute.  *Id.*

The Court reaffirmed this intent-based analysis in subsequent cases.  In *Smith v. Robinson*, 468 U.S. 992 (1984), the plaintiffs brought suit against their child's school district for relief under both the Education of the Handicapped Act (EHA) and, pursuant to § 1983, the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  The Court first looked to the text of the statute and its legislative history and found Congress's express statements that it had designed the EHA to help the States "comply[] with their constitutional obligations to provide public education for" children with disabilities.  *Id.* at 1009–10.  It next reviewed the statute's procedural mechanisms, focusing on the "comprehensive nature of the procedures and guarantees" in the EHA.  *Id.* at 1010–11.  The Court concluded that the language of the statute, its legislative history, and the comprehensive nature of its procedures and remedies reveal Congress's intent that the statute to be the "exclusive avenue" for plaintiffs to bring all their claims and, thus, § 1983 claims were precluded.  *Id.* at 1012–13.

A few years later, in *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), the Court examined preclusion of § 1983 claims where the plaintiff sought injunctive relief under the Telecommunications Act (TCA), but damages and attorney's fees under § 1983 for violations of the federal statute.  This returned the Court to a comparison between statutes, as in *Sea Clammers*.  The Court concluded that the detailed and restrictive remedies in the TCA "were deliberate" and indicated Congress's intent that the statutory remedies were "not to be evaded through § 1983."  *Id.* at 124.

In the most recent Supreme Court authority on these issues, *Fitzgerald,* the Court explained the distinction between § 1983 claims premised on constitutional violations and those based on statutory violations in determining whether a § 1983 claim is precluded. "In those cases in which the § 1983 claim is based on a statutory right, evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Fitzgerald*, 555 U.S. at 252. The Court then explained:

> In cases in which the § 1983 claim alleges a constitutional violation, lack of congressional intent may be inferred from a comparison of the rights and protections of the statute and those existing under the Constitution. Where the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights. Our conclusions regarding congressional intent can be confirmed by a statute's context.

*Id.* at 252–53 (quotation marks and citations omitted). The Court examined Title IX under this framework and found that it contained only an implied private right of action rather than an express private remedy, lacked a comprehensive remedial scheme, and its substantive protections diverged from those provided by the Equal Protection Clause. *Id.* at 256–58. The Court determined that Title IX did not foreclose the plaintiff's equal protection claim brought under § 1983. In doing so, it acknowledged that it was mindful of *Smith's* admonition to "not lightly conclude that Congress intended to preclude § 1983 as a remedy for a substantial equal protection claim." *Id.* at 256 (quoting *Smith*, 468 U.S. at 1012). Indeed, when the Supreme Court found in *Smith* that the EHA precluded an equal protection constitutional claim under § 1983, the Court based its decision on those three key components—the express language of the EHA and its legislative history, the comprehensive nature of remedial scheme, and the Court's conclusion that the plaintiffs' constitutional claims were "virtually identical to their EHA claims." *Smith*, 468 U.S. at 1009–12.

*Fitzgerald* was preceded and followed by our own cases that articulate standards in line with the test it set out. We found a § 1983 claim under the First Amendment not precluded by the whistleblower provisions of the SDWA. *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 615 (6th Cir. 2001). *Communities for Equity*, in which we denied preclusion by

Title IX and authorized an equal protection claim under § 1983, was part of the circuit split that preceded and ultimately led to the Supreme Court's decision in *Fitzgerald*. *See Communities for Equity*, 459 F.3d at 683–91. Setting out the governing test, *Fitzgerald* resolved this circuit split by determining, as we did, that Congress did not intend for Title IX to preclude a § 1983 remedy for a plaintiff's equal protection claim. *See* 555 U.S. at 256.

Based on the case authority set out above, the Plaintiffs in *Boler* and *Mays* aver that they do not "invoke[] § 1983 . . . as a vehicle to enforce the substantive federal law found in [the SDWA], but as a vehicle to recover for alleged violations" of various constitutional provisions, including the Contract Clause, Equal Protection Clause, and Due Process Clause—allegations that they state would be actionable even if Congress had never enacted the SDWA. *Communities for Equity*, 459 F.3d at 684. Plaintiffs argue that the fact that Congress "created a set of substantive statutory requirements, and adopted a set of procedures for enforcing *those* requirements, does not . . . suggest that Congress intend[ed] to foreclose a Section 1983 remedy for the violations of independent rights that find their source, not in laws passed by Congress, but in the Constitution itself."

The focus of our inquiry on this question is congressional intent. *See Communities for Equity*, 459 F.3d at 684 ("The question of what Congress intended . . . concerns not only which remedies Congress sought to provide for [statutory] violations, but whether Congress intended to abandon the rights and remedies set forth in [constitutional jurisprudence] when it enacted [the statute]."). "The burden . . . lies with the defendant in a § 1983 action to prove preclusion." *Charvat*, 246 F.3d at 615.

## 1. Statutory Text and Legislative History

The beginning point for examining congressional intent is the language of the statute. *See Sea Clammers*, 453 U.S. at 13 ("We look first, of course, to the statutory language, particularly to the provisions . . . for enforcement and relief. Then we review the legislative history and other traditional aids of statutory interpretation to determine congressional intent."). We addressed this very issue in *Charvat,* and determined that the whistleblower provisions of the SDWA and Clean Water Act (CWA) did not preclude the First Amendment claims brought by

that plaintiff pursuant to § 1983. *See* 246 F.3d at 613–15. Our analysis focused solely on the SDWA's whistleblower provisions; we found that they provide for an administrative remedy only and determined the remedies provided to be insufficiently comprehensive to foreclose relief under § 1983. *Id.* at 614–15. The Plaintiffs argue that *Charvat* was an application of the principle that a federal statutory scheme will not preempt independently existing constitutional rights when those rights have contours distinct from the statutory claim.

*Charvat* does not control our decision here, but we find instructive its analysis that emphasizes a focus on the wording of the statute. That focus accords with *Fitzgerald's* analysis, which clarifies that review differs depending on whether "the § 1983 claim is based on a statutory right" or "alleges a constitutional violation." 555 U.S. at 252. *Fitzgerald* concludes its explanation of that distinction by noting that "[c]ontext, not just literal text, will often lead a court to Congress' intent in respect to a particular statute." *Id.* (quoting *Rancho Palos Verdes*, 544 U.S. at 127 (Breyer, J., concurring)).

In *Sea Clammers* and *Rancho Palos Verdes*, the Court determined that the statutory remedies at issue were sufficiently comprehensive to evince congressional intent to preclude § 1983 claims for *violations of the statute*. In *Smith*, the Court addressed whether the EHA precludes a § 1983 claim based on *a constitutional violation* and began with a focus on what the legislature said in the Act and its legislative history. The Court found that specific provisions of the EHA evidenced that it was enacted for the very purpose of allowing children with disabilities to pursue their constitutional claims. *See Smith*, 468 U.S. at 1009–12. Explaining its context, the Act noted that "Congress also recognized that in a series of 'landmark court cases,' the right to an equal education opportunity for handicapped children had been established." *Id.* at 1010 (quoting S. Rep. No. 94-128, at 13 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1425, 1425). In addition to protecting that right, the legislative history stated the purpose of Congress in passing the Act: "to provide assistance to the States in carrying out their responsibilities under State law and the *Constitution of the United States* to provide equal protection of the laws." *Smith*, 468 U.S. at 1010 (quoting S. Rep. No. 94-128, at 6 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1425, 1437) (emphasis added). As a result, the Court found that the EHA

contained the expression of Congress's intention to preclude a § 1983 claim based on a constitutional violation.

We examine the Safe Drinking Water Act in light of the analysis employed by these precedent cases. The language of the SDWA centers on instructions to the EPA to establish the requirements for national drinking water standards. *See* 42 U.S.C. § 300g-1. Its provisions set out standards identifying particular contaminants selected for regulation and establishing maximum levels that limit the amount of those specified contaminants permitted in public drinking water systems. *See id.* § 300g-1(b). The statutory language also specifies the time frame for the EPA's promulgation of regulations, the use of science in the EPA's decisionmaking, and the technology by which public systems should achieve compliance with the standards. *See id.*

The Defendants have not pointed to any indications of preclusive intent in the text or legislative history of the SDWA in their briefing, nor were they able to do so at argument. The Plaintiffs point to portions of the text and legislative history of the SDWA that they suggest show the statute was *not* intended to foreclose § 1983 claims for constitutional rights. For example, the SDWA was adopted pursuant to Congress's power under the Commerce Clause, U.S. Const. Art. I, § 8, rather than its power under Section 5 of the Fourteenth Amendment to enforce constitutional rights. *See Nebraska v. E.P.A.*, 331 F.3d 995, 999 (D.C. Cir. 2003) (stating that "the Commerce Clause provides the constitutional authority for" the SDWA). Accordingly, the Plaintiffs note that the findings enunciated in the SDWA emphasize Congress's focus on the interstate economic impacts of polluted drinking water, not on any constitutional violations that may accompany the pollution.

Unlike the EHA examined in *Smith*, the SDWA does not use language related to constitutional rights, or codify legal standards that appeared in prior cases to enforce rights guaranteed by the Constitution. *See Smith*, 468 U.S. at 1009–10. We find no clear inference from either the text of the statute or its legislative history that Congress intended for the SDWA's remedial scheme to displace § 1983 suits enforcing constitutional rights. This, in turn, informs our next step—evaluating the comprehensiveness of the remedial scheme provided by the statute.

2. Remedial Scheme

Lacking textual support from the statute or its legislative history, the Defendants contend that the SDWA's remedial scheme is so comprehensive that it demonstrates congressional intent to preclude remedies under § 1983. They argue that the remedial provisions of the SDWA are similar to those examined in *Sea Clammers* which, along with the First Circuit's holding in *Mattoon*, should direct our inquiry and conclusion, as they did that of the district court.

The SDWA's remedial scheme authorizes the EPA Administrator to compel compliance with the standards promulgated by the statute, 42 U.S.C. § 300g-3(b), and to assess civil penalties against violators of SDWA regulations. *Id.* § 300g-3(g)(3). The statute also provides for judicial review of the Administrator's actions, including the establishment of drinking water regulations, *id.* § 300j-7(a), and contains a citizen-suit provision allowing a private action against any person in violation of the statute for injunctive relief. *Id.* § 300j-8. Plaintiffs bringing claims under the SDWA must also comply with certain procedural requirements, including providing a notice of intent to potential defendants 60 days prior to filing suit. *Id.* § 300j-8(b)(1)(A). This remedial scheme contains a number of similarities to the schemes in the pollution statutes in *Sea Clammers*.

The Plaintiffs respond that the SDWA's savings clause, *id.* § 300j-8(e), demonstrates that Congress intended to preserve independent remedies for conduct also violating the statute. The savings clause states that "[n]othing in this section [establishing the SDWA's private right of action] shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any requirement prescribed by or under this subchapter or to seek any other relief." *Id.* § 300j-8(e). *Sea Clammers* rejected a similar argument about the FWPCA and MPRSA's savings clauses, which were similarly worded. *See Sea Clammers*, 453 U.S. at 20 n.31. The Court found that it was "doubtful that the phrase 'any statute' include[d] the very statute in which [that] statement was contained." *Id*. at 15–16. But that determination was premised on violations of the statute itself. The Court also recognized that the savings clause was intended to "allow further enforcement of antipollution standards arising under other statutes or state common law." *Id.* at 20 n.31; *see also Guertin v. State of Mich.*, No. 16-cv-12412, 2017 WL 2418007, at *13–14 (E.D. Mich. June 5, 2017) (finding that the "robust

savings clause" in the SDWA is "explicit evidence that Congress did not mean to preempt" the plaintiffs' constitutional claims because such a finding would "certainly affect" the plaintiffs' ability to bring such claims). The language of the SDWA's savings clause lends support to a conclusion that Congress contemplated leaving open § 1983 as an avenue of relief for claims arising under the Constitution.

We pause to address *Mattoon*, which we do not find dispositive. The plaintiffs in *Mattoon* brought claims premised on SDWA violations, and a claim of infringement of an alleged "constitutional right to safe drinking water." 980 F.2d at 5. The Plaintiffs here do not allege that violation, but rather bring claims for violations of specific constitutional provisions including the Contract Clause, Equal Protection Clause, and Due Process Clause. More importantly, the First Circuit's conclusion predated *Fitzgerald*, where the Supreme Court explained that when reviewing cases in which the § 1983 claim alleges a constitutional violation, the appropriate framework is to seek to infer congressional intent from the text and legislative history of the statute, review the nature and extent of the remedial scheme, and compare the rights and protections of the statute with those found in the Constitution. *See Fitzgerald*, 555 U.S. at 252.

*Communities for Equity* teaches that where constitutional claims such as those here are at issue, the question of congressional intent "concerns not only what remedies Congress sought to provide" for SDWA violations, "but whether Congress intended to abandon the rights and remedies set forth in Fourteenth Amendment equal protection jurisprudence" when it enacted the SDWA. 459 F.3d at 684.

The SDWA's remedies are more limited than those generally available under § 1983, as the statute provides for injunctive relief only, not for recovery of damages or other monetary relief available to Plaintiffs with successful § 1983 claims. Though the statute contains a private right of action, it also includes a savings clause establishing that its private action does not restrict rights a person may exercise outside the SDWA. The availability of a private judicial remedy in the SDWA, moreover, does not conclusively establish congressional intent to preclude relief under § 1983. *Rancho Palos Verdes*, 544 U.S. at 122. Rather, we examine whether there are statutory indications "express or implicit" that the remedy is meant to "complement, rather

than supplant, § 1983." *Id.* And we do so in accordance with *Fitzgerald*'s admonition that we should be "mindful" to "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial [constitutional] claim." *Fitzgerald*, 555 U.S. at 252.

In the context of the SDWA and its text and legislative history, we find that the remedial schemes in the SDWA are not so comprehensive as to demonstrate congressional intent to preclude remedies under § 1983 for constitutional violations. This leaves us with the last consideration set out in *Fitzgerald's* framework—a comparison of the substantive rights and protections of the SDWA to the protections provided by the relevant constitutional provisions. It is Defendants' burden to show that this comparison reveals a congressional intention for the SDWA to preclude remedies provided for under § 1983.

### 3. Contours of the Rights and Protections

*Fitzgerald* teaches that in examining the SDWA, we ask whether "the contours of the rights and protections" provided by the SDWA and those existing under the Constitution "diverge in significant ways." *Fitzgerald*, 555 U.S. at 252. If they do, this "lends further support to the conclusion that Congress did not intend [the statute] to preclude § 1983 constitutional suits." *Id.* at 256. In *Fitzgerald*, the Court highlighted Title IX's protections as "narrower in some respects and broader in others," and determined that this divergent coverage, along with the lack of a sufficiently comprehensive remedial scheme, showed that the statute was not intended to foreclose § 1983 relief. *Id.* at 256, 258. The Court examined the reach of Title IX's remedial scheme as compared to the § 1983 claims, activities exempt under the statute that could nonetheless form the basis for equal protection claims, and the congruity of standards for establishing liability where particular activities and defendants might be subject to actions under both Title IX and the Equal Protection Clause. *Id.* at 257–58. It highlighted that claims brought to enforce the safeguards of the Equal Protection Clause reach only state actors, while Title IX reaches "institutions and programs [receiving] federal funds, which may include nonpublic institutions." *Id.* at 257 (citations omitted). The Court illustrated how the standards for governing liability were not congruent: a Title IX plaintiff could establish deliberate indifference and school district liability for harassment through the conduct of "a single school administrator with authority," but a similar equal protection claim against the district, brought via § 1983,

would require showing that "the harassment was the result of municipal custom, policy, or practice." *Id.* at 257–58 (citation omitted).

The Plaintiffs emphasize the divergence between the rights protected by the SDWA and those protected by their constitutional claims. The Defendants maintain that the § 1983 claims are, at their heart, based on misconduct addressed by the SDWA, arguing that they have the same factual basis as potential SDWA claims and that the allegations made in the Plaintiffs' complaint stem from responsibilities and duties imposed by the SDWA.

The SDWA's citizen-suit provision authorizes action against "any person," which therefore reaches both nonpublic actors as well as the state actors covered by § 1983. *See* 42 U.S.C. § 300j-8(a). But even with some overlap in coverage, the substantive standards within the statute diverge significantly from the protections afforded by the Constitution. The *Boler* Plaintiffs allege violations of several constitutional provisions, including the Contract Clause, Due Process Clause, and Equal Protection Clause. The *Mays* Plaintiffs also allege due process and equal protection violations. All Plaintiffs argue that each of these constitutional rights diverge significantly from the rights and protections provided by the SDWA. We agree.

The distinct coverage of the Equal Protection Clause provides a clear example. The citizen-suit provision allows a plaintiff to file a SDWA action to "enforce . . . any requirement prescribed by or under" the statute. *Id.* The SDWA establishes maximum contaminant levels through its national primary drinking water regulations, which most public water systems may not exceed. *Id.* § 300g-1. These regulations reach only certain harmful contaminants in drinking water, and do not redress harms caused by many other contaminants that are unregulated by the SDWA. Establishing a violation of the statute does not require proof of intent or meeting any specific standard beyond showing contaminant levels in excess of the maximum established by the regulations. The statute would thus cover both intentional and negligent conduct, as long as it violated the regulation.

In a wide variety of circumstances, conduct that violates the SDWA might not violate the Equal Protection Clause, and vice versa. For example, a government entity could provide water through a public system with contaminant levels in excess of national drinking water standards

without infringing on any equal protection principles. Likewise, a government entity could provide some customers with water that meets the requirements of SDWA standards, but that is nonetheless dirtier, smellier, or of demonstrably poorer quality than water provided to other customers. The water also could be polluted by a contaminant not regulated by the SDWA. Even though not violating the SDWA, these situations could create an equal protection issue, particularly if such distinction were based on intentional discrimination or lacked a rational basis.

A Due Process Clause example further highlights this divergence in coverage. The *Mays* and *Boler* Plaintiffs both allege that the Defendants denied them due process of law through the state-created danger doctrine, by exposing them to the contaminated water sourced from the Flint River. Establishing a due process violation through the state-created danger doctrine requires showing:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citations omitted). The plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment," which varies depending on the circumstances. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). A deliberate indifference standard is used to establish culpability "in settings [that] provide the opportunity for reflection and unhurried judgments, but . . . a higher bar may be necessary when opportunities for reasoned deliberation are not present." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006) (quotation marks and citations omitted).

A violation of the SDWA that does not meet a deliberate indifference standard, such as a state actor's negligent action resulting in contaminant levels above the established maximum, plainly would not meet the requirements of a due process violation. Likewise, a state actor's deliberately indifferent action concerning contaminants in public water systems, which created a special danger to a plaintiff that the state knew or should have known about, could violate the

Due Process Clause without also violating the SDWA, if the hypothetical contaminants did not exceed the statutory maximums or were not regulated by it.

Under some circumstances, actions that violate the SDWA may also violate the Equal Protection Clause or Due Process Clause. The Defendants argue that this is necessarily the case, and that the Plaintiffs' claims could not be pursued without showing a violation of the SDWA.[4] But as noted, that is often not the case, particularly where the SDWA does not even regulate a contaminant harmful to public drinking water users. The contours of the rights and protections of the SDWA and those arising under the Constitution, and a plaintiff's ability to show violations of each, are "not . . . wholly congruent." *Fitzgerald*, 555 U.S. at 258. This further supports the conclusion that Congress did not intend to foreclose § 1983 suits by enacting the SDWA.

The Defendants also appear to argue that the Plaintiffs have not actually shown that their constitutional rights were violated, as pled by the Complaints filed in *Boler* and *Mays*. But these arguments are irrelevant to the preemption question at hand—particularly because the Defendants' arguments seek to address the merits of the claims, and the district court apparently treated the issue of preclusion as jurisdictional. The Defendants urge us to consider the due process claims as pled in these cases, and determine that the Complaints do not establish constitutional violations. At the motion to dismiss stage, however, we focus on the availability of a cause of action, not whether the plaintiffs have proven that these constitutional rights were violated.

Having resolved that there is no textual indication in the SDWA that Congress expressly chose to preempt § 1983 claims and that the provisions of the remedial scheme do not demonstrate such an intention, we also find that the contours of the rights and protections found in the constitutional claims diverge from those provided by the SDWA such that we infer lack of congressional intention to foreclose § 1983 claims. The Defendants have not demonstrated that "Congress intended to abandon the rights and remedies set forth in Fourteenth Amendment equal

---

[4]The Defendants also argue that the Plaintiffs' claims rest on a constitutional right to safe drinking water, which no courts have found to be a fundamental right. But the Plaintiffs explicitly deny that they seek to enforce such a right, or that their claims must rest on such a right. This argument appears principally to concern the Plaintiffs' substantive due process claims. But to show that the state-created danger doctrine or a person's fundamental right to bodily integrity have been violated, a Plaintiff does not need to establish any constitutional significance to the means by which the harm occurs—in this case, unsafe drinking water.

protection jurisprudence" when it enacted the SDWA. *Communities for Equity*, 459 F.3d at 684. Under the governing precedent, primarily that of the Supreme Court, the Defendants have not carried their burden and the Plaintiffs may thus move forward with their cases. We find that the SDWA does not preclude § 1983 claims as pled by the *Boler* and *Mays* Plaintiffs, and reverse the district court's dismissal of their Complaints on that basis.

**B.  Section 1985 Claims**

The Plaintiffs also brought claims under 42 U.S.C. § 1985(3), alleging that the defendants conspired to deprive them "of the equal protection of the laws, or of equal privileges and immunities under the laws." The district court did not address this claim when dismissing *Boler*, presumably finding that it failed because the plaintiffs' § 1983 claims were preempted by the SDWA. In *Mays*, the district court explicitly dismissed the Plaintiffs' § 1985(3) claim, determining that "[w]ithout viable constitutional claims" under § 1983, the Plaintiffs' "conspiracy claim under § 1985(3) based upon the same conduct also fails." Since we find that the SDWA does not preclude the Plaintiffs' § 1983 claims, we likewise reverse the district court's dismissal of their claims brought under § 1985(3).

**C.  Eleventh Amendment Sovereign Immunity**

The State of Michigan, Governor Snyder, MDEQ, and MDHHS (collectively, "State Defendants") argue that the Eleventh Amendment serves as a separate and independent jurisdictional bar to the plaintiffs' claims against them. The *Boler* Plaintiffs respond that the State Defendants' conduct in litigation constitutes waiver of their Eleventh Amendment protections. Both the *Boler* and *Mays* Plaintiffs assert that the *Ex Parte Young* doctrine applies to their claims against Governor Snyder.

Though not addressed by the district court, we examine the question of sovereign immunity as part of our continuing obligation to consider our jurisdiction over the appeal. *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016). Sovereign immunity protects states, as well as state officials sued in their official capacity for money damages, from suit in federal court. *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005). It also applies to state agencies or departments, such as MDEQ and MDHHS. *See Pennhurst State Sch.*

& *Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Sovereign immunity "does not extend to counties and similar municipal corporations," such as the defendants associated with the City of Flint in these cases.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).  There are three exceptions to sovereign immunity: (1) when the state has waived immunity by consenting to the suit; (2) when Congress has expressly abrogated the states' sovereign immunity, and (3) when the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908), applies.  *See Puckett*, 833 F.3d at 598.  Section 1983 does not abrogate Eleventh Amendment immunity.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) (stating that Congress did not intend to "disturb the States' Eleventh Amendment immunity" by passing § 1983).  As a result, only the other two exceptions—consent or the application of *Ex Parte Young*—may apply in these cases.

1.  State Waiver Via Conduct in Litigation in *Boler*

Consent to a suit may be indicated expressly, or "take the form of a voluntary appearance and defense on the merits in federal court."  *Lawson v. Shelby Cty.*, 211 F.3d 331, 334 (6th Cir. 2000).  Removing an action from state to federal court will constitute waiver.  *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002).  But appearance in court to present certain defenses, such as a statute of limitations argument, is not a defense on the merits indicating waiver of immunity.  *See Akers v. Cty. of Bell*, 498 F. App'x 483, 490 (6th Cir. 2012).  In *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003), we determined that by engaging in substantial discovery, filing a motion for summary judgment, and only raising an Eleventh Amendment defense after an adverse ruling on the summary judgment motion, the State of Tennessee had voluntarily invoked jurisdiction sufficient to waive its sovereign immunity defense.

The *Boler* Plaintiffs first argue that the State Defendants' conduct in litigation demonstrates their consent to the suit, specifically by passing legislation with the intent of affecting the Plaintiffs' claims.  Public Act 24, which provided $30 million in appropriations for the Flint water crisis, was signed into law on February 26, 2016, two days after the Plaintiffs filed for a preliminary injunction.  The Plaintiffs assert that the State Defendants increased their efforts to pass Act 24 only after they knew the motion for a preliminary injunction was imminent, and that the legislation was passed in part to be used as a "tool in litigation."  As

evidence, the Plaintiffs point to the State Defendants' briefing on jurisdiction before the district court, where they argued that Act 24 "mooted" the Plaintiffs' requests for relief.  The Plaintiffs argue that this conduct, as well as the State Defendants' participation in settlement negotiations, demonstrates their consent to litigation in the interests of reaching a resolution on the merits.

As support, the Plaintiffs cite *Vaquerias Tres Monjitas, Inc. v. Comas*, 992 F. Supp. 2d 39, 47 (D.P.R. 2013), where the court stated that "once the Government voluntarily agreed to use public funds" to compensate the plaintiffs for their losses as a result of pricing violations, the Commonwealth of Puerto Rico "expressly waived its Eleventh Amendment immunity by its conduct in litigation."  The court also found that the Commonwealth's participation in settlement agreements further confirmed this waiver.  *Id.*  However, on appeal, the First Circuit forcefully stated that the district court's determination that Puerto Rico had waived its Eleventh Amendment immunity was "in no sense necessary to . . . entry of the judgment," and that the statements were "dicta," "wholly gratuitous," and "ha[d] the obvious effect of causing confusion."  *Vaquerias Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 23 (1st Cir. 2014).  The First Circuit emphasized that the "standard for finding [Eleventh Amendment] waiver is a stringent one," and strongly suggested that the district court amend the order to delete the language.  *Id.* at 27.  The applicability of the district court's opinion in *Vaquerias* is therefore quite limited.  Nor have we found other support for the proposition that encouraging the passage of an appropriations bill that might affect a plaintiff's claims or engaging in settlement negotiations would constitute conduct in litigation that indicates consent to waive sovereign immunity.

Though we find that the State Defendants have participated in some litigation conduct, their actions do not rise to the level of a waiver of their Eleventh Amendment immunity.  We note that their defense that the SDWA precludes the Plaintiffs' § 1983 claims is arguably a "defense on the merits in federal court," *Lawson*, 211 F.2d at 334, since other courts have typically treated similar claims as merits issues rather than threshold questions of jurisdiction.  But since the district court considered the argument to be jurisdictional and the *Boler* appeal follows from the court's ruling on a 12(b)(1) motion, we find that the State Defendants' participation in the argument does not constitute a defense on the merits.

We also note that the State Defendants presented a defense to the *Boler* Plaintiffs' motion for a preliminary injunction, arguing against the merits of the case without raising the issue of sovereign immunity. Nor did the issue arise in the defendants' Joint Statement of Resolved and Unresolved Issues. The State Defendants first invoked the defense of sovereign immunity in their Supplemental Brief for Jurisdictional Arguments, which was prompted by the district court at a status conference. Nonetheless, this participation in litigation does not rise to the level of waiver. In *Ku*, Tennessee only raised an Eleventh Amendment defense after "engaging in substantial discovery, filing a motion for summary judgment," and the district court had issued a "final adverse ruling." 322 F.3d at 432; *see also Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 801–02 (S.D. Ohio 2012) (finding that the Board of Elections, which was an arm of the state, had waived Eleventh Amendment immunity by participating in extensive pre-trial activities before the district court and Sixth Circuit, including appealing the district court's order granting a preliminary injunction, participating in a discovery conference, and filing a trial brief). The State Defendants' conduct does not rise to the same level in this instance, where the district court never issued any final judgments before the motion to dismiss and the parties had not yet engaged in discovery. We find that the State Defendants have not waived their sovereign immunity, and affirm the district court's dismissal of the *Boler* Plaintiffs' claims against the State of Michigan, MDEQ, and MDHHS on this basis.[5]

## 2. The *Ex Parte Young* Doctrine

The exception set forth in *Ex Parte Young* allows plaintiffs to bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations, "regardless of whether compliance might have an ancillary effect on the state treasury." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (citations omitted). But the doctrine does not extend to retroactive relief or claims for money damages. *Id.* at 508; *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974). To determine if *Ex Parte Young* applies, we "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as

---

[5]The *Boler* Plaintiffs also argue that the State Defendants, through operation of the Emergency Manager law, became agents and servants of the City of Flint, which does not have Eleventh Amendment immunity. The Plaintiffs offer no support for this argument, and it does not overcome the Eleventh Amendment bar.

prospective.'"  *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)) (alteration in original).

### a. *Application of* Ex Parte Young *to Governor Snyder in* Boler

The State Defendants argue that *Ex Parte Young* is inapplicable because the *Boler* Plaintiffs do not actually seek prospective injunctive relief against Governor Snyder, but restitution, and because they have not shown any ongoing violations of federal law.  The Plaintiffs respond that *Ex Parte Young* applies to the injunctive relief they seek, and that the State Defendants, including Governor Snyder, continue to play an active role in the water crisis that is producing ongoing violations of their constitutional rights.

But the *Boler* Complaint does not make clear what those ongoing violations are.  The State Defendants posit that the Plaintiffs concede that there is no threat to their ongoing rights by acknowledging that Flint has already reconnected to DWSD.  Though we do not find any such concession, the Complaint does appear to be focused on Governor Snyder's conduct up until October 2015, when he "belatedly" ordered that the Flint system be reconnected to DWSD. The Plaintiffs allege that this action was part of his participation in "creating, escalating, and prolonging the dangers" to Flint water consumers, but do not clarify his ongoing involvement beyond that point.  The State Defendants argue that the proposed class focuses on Flint residents who were billed for water between April 2014 and October 2015, suggesting that the conduct at issue took place within that time period.  But many Complaint allegations center on the Plaintiffs' obligation to pay for contaminated water, which is ongoing, and allegedly impairs their constitutional rights under the Contract Clause and Due Process Clause.

Even if we were to find that the Complaint alleges an ongoing violation of federal law, it is not clear what injunctive relief is sought.  Though each count alleged requests injunctive relief, and the prayer for relief asks for "[a]ny other relief, including injunctive relief, as [the c]ourt deems fair," the Plaintiffs provide no indication as to what this injunctive relief might be.  Under our plain reading of the Complaint, the *Boler* Plaintiffs have not shown that the *Ex Parte Young* doctrine applies to their claims against Governor Snyder.

### b. *Application of* Ex Parte Young *to Governor Snyder in* Mays

Similarly, the State Defendants argue that *Ex Parte Young* does not apply in *Mays,* because the injunctive relief sought is not prospective or actually injunctive, and because declaratory relief is unavailable. Defendants also argue that the Plaintiffs have not shown any ongoing violations of their constitutional rights because they have "essentially concede[d] that no such threat exists" by acknowledging that Flint has reconnected to DWSD.**[6]**

But this takes too narrow a view of the ongoing constitutional violations that the Plaintiffs allege. Damage to the water pipes has been done, and has ongoing effects. The Complaint specifically refers to Flint's current State of Emergency, which continues to the present day. It also alleges that the relief efforts by public officials have been "ineffective [and] often frivolous[] in mitigating the devastation caused" by the crisis and such "ineffective relief efforts" have themselves prolonged the effects of the crisis. This is sufficient to show an ongoing violation of the Plaintiffs' constitutional rights, especially considering that they bring claims for, among other things, state-created danger and violation of their fundamental right to bodily integrity.

Moreover, the *Mays* Complaint specifically seeks "[a]n injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide healthcare and other appropriate services to Class members for a period of time deemed appropriate by the Court." It also seeks the "[a]ppointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, [and] criminal and juvenile justice evaluations." The State Defendants argue that this relief is somehow "clearly" an attempt to obtain "retroactive damages unavailable under *Young*." But "[a] court may enter a prospective suit that costs the state money . . . if the monetary impact is ancillary, *i.e.*, not the primary purpose of the suit." *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002).

---

**[6]**The Defendants also argue that the *Mays* Plaintiffs' claims against the State of Michigan are barred based on sovereign immunity. The only claims asserted against the State of Michigan in *Mays* are Counts I and II, which allege violations of substantive due process and are brought pursuant to § 1983. The Defendants argue that the State has not consented to suit and is not a proper defendant in a cause of action brought under § 1983. The Plaintiffs appear to concede this point. We thus affirm the district court's dismissal of the *Mays* Plaintiffs' claims against the State of Michigan as barred by sovereign immunity.

For example, the Supreme Court upheld an order enjoining a state to provide education programs as a way of redressing past racial discrimination. *See Milliken v. Bradley*, 433 U.S. 267, 288–90 (1977). The injunctive order did not award money retroactively, but directed the state's conduct in the future.

That is what the Complaint seeks here: to direct the Governor's conduct in providing services to Plaintiffs affected by the Flint water crisis. The primary purpose of this relief is not to cost the State of Michigan money, but to provide relief to the Plaintiffs through compensatory education, medical monitoring, and evaluation services. A straightforward look at the Complaint shows that this relief is properly characterized as prospective. *See Verizon*, 535 U.S. at 645. Thus, we find that *Ex Parte Young* applies to the claims made against Governor Snyder in *Mays*.

In sum, Eleventh Amendment sovereign immunity applies to the State of Michigan in both *Mays* and *Boler*, as well as to the *Boler* Plaintiffs' claims against the MDEQ, MDHHS, and Governor Snyder. The district court's dismissal of the Plaintiffs' claims against these Defendants is affirmed. As noted above, Eleventh Amendment sovereign immunity does not apply to municipalities; thus, the *Boler* Plaintiffs' claims against the City Defendants—Earley and Ambrose, former Emergency Managers of Flint; Walling, former Mayor of Flint; and the City of Flint—remain. Similarly, the *Mays* Plaintiffs' claims against all Defendants except the State of Michigan remain.

**D. Dismissal Under Alternate Grounds**

The Defendants argue that, even if not precluded by the SDWA, the Plaintiffs' § 1983 claims should be dismissed for several alternate reasons. They argue that the dismissal of both *Boler* and *Mays* should be affirmed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Defendants also argue that *Boler*'s dismissal should be affirmed because the claims are merely artfully-pled state law claims, or are based on a recently issued EPA administrative order. Several Defendants in *Mays* also argue that claims against them should be dismissed based on absolute or qualified immunity, or as impermissibly relying on the doctrine of *respondeat superior*. We do not find any of these arguments availing.

### 1.  Dismissal Under Rule 12(b)(6) for Failure to State a Claim

The Plaintiffs correctly note that the only issues currently before us are the dismissal of their § 1983 claims as preempted by the SDWA and the question of sovereign immunity.  Even though we have determined that the § 1983 claims are not foreclosed, the Defendants seek affirmance under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  We may affirm the district court on any basis supported in the record.  *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002); *see also Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011) (affirming the district court on an alternative basis when it "further[ed] the interests of judicial economy and d[id] not unfairly prejudice the parties, as the issue ha[d] been raised and fully briefed").  We decline to do so here.

First, *Boler* was dismissed pursuant to a Rule 12(b)(1) motion for lack of subject matter jurisdiction.  Though *Mays* was apparently dismissed after motions brought under both Rule 12(b)(1) and (12(b)(6), the district court premised the dismissal on its resolution in *Boler*—where it treated the issue as jurisdictional.  The district court "has [not] addressed the merits of [the Plaintiffs'] constitutional claims or even the sufficiency of their pleadings." *Fitzgerald*, 555 U.S. at 260.  Nor have the Plaintiffs been given an opportunity to fully brief the merits of their constitutional claims, which involve factual complexities that are best examined by the district court in the first instance.  Moreover, the *Boler* and *Mays* Plaintiffs bring distinct constitutional claims, based on different factual underpinnings and legal arguments.  A consolidated appeal is not the appropriate occasion to evaluate these claims for the first time.  Such an analysis, moreover, could unfairly prejudice the Plaintiffs, who have only addressed the Defendants' Rule 12(b)(6) arguments in their reply briefs.  We believe the district court is in the best position to evaluate these arguments upon remand.

### 2.  Alternate Grounds for Dismissal of *Boler* Claims

The Defendants also argue that *Boler* should be dismissed for two additional reasons: (1) because the Plaintiffs' claims are merely artfully-pled state law claims, and (2) based on a recent EPA administrative order.  Neither argument merits affirming the district court's dismissal.

First, the district court did not examine the Defendants' argument that the *Boler* Plaintiffs' § 1983 claims are merely artfully-pled state law breach of contract claims. "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of [a] federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior [precedent], or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)). That standard is easily overcome here, where the Plaintiffs have alleged several substantial constitutional claims sufficient to survive under Rule 12(b)(1). Any further evaluation of these claims on the merits, such as their sufficiency under Rule 12(b)(6), should first be performed by the district court upon remand as discussed above.

Second, the Defendants also argue that dismissal of *Boler* is justified based on the EPA's recently issued Emergency Administrative Order (EAO), which directed the City of Flint and State of Michigan to take certain steps to address the Flint water crisis. The Defendants assert that the relief requested in *Boler* would require the district court to review and rule on the EAO, but that exclusive jurisdiction to do so is vested in the court of appeals. *See* 42 U.S.C. § 300j-7(a)(2). The Plaintiffs do not seek review of or alterations to the EAO, and their claims do not constitute an appeal of a "final Agency action" by the EPA that would bring the action under the ambit of the SDWA's judicial review provision. *Id.* Rather, their claims and the relief they seek "may parallel the EPA's directives to . . . Flint and Michigan . . . [or] augment those orders." *Concerned Pastors for Soc. Action v. Khouri*, 194 F. Supp. 3d 589, 599 (E.D. Mich. 2016) (evaluating and rejecting the same argument made by many of the same Defendants in this action). The EAO does not justify affirming the district court's dismissal for lack of subject matter jurisdiction.

### 3.  Alternate Grounds for Dismissal of *Mays* Claims

The MDEQ Defendants also argue that dismissal of the *Mays* Plaintiffs' claims against them should be affirmed on alternate grounds: (1) based on absolute or qualified immunity, or (2) as improperly seeking relief based on the doctrine of *respondeat superior*.  Again, we find that neither argument provides an alternate basis to affirm the district court's dismissal.**[7]**

### a.  Absolute or Qualified Immunity of MDEQ Officials

The MDEQ Defendants argue that the *Mays* claims against them are barred by absolute immunity, which protects persons "performing adjudicatory functions within a federal agency . . . from damages liability for their judicial acts." *Butz v. Economou*, 438 U.S. 478, 514 (1978).  The shield of absolute immunity has been extended to some officials who "perform functions closely associated with the judicial process." *Cleavinger v. Saxner*, 474 U.S. 193, 200–01 (1985).  But the Supreme Court has also been "'quite sparing in [its] recognition of absolute immunity,' and has declined 'to extend it any further than its justification would warrant.'" *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 348 (6th Cir. 2015) (quoting *Burns v. Reed*, 500 U.S. 478, 487 (1991)).  As such, officials seeking "absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz,* 438 U.S. at 506.

The MDEQ Defendants have not done so here.  While they broadly assert that their actions "are analogous to those of a prosecutor exercising his prosecutorial discretion to bring suit," they provide no case law showing that courts have found MDEQ officials, or public officials making similar decisions to those made by the MDEQ, to be entitled to absolute immunity.  Nor have they provided an application of any of the factors we have used to determine that public officials are entitled to quasi-judicial immunity, such as the need to assure

---

**[7]**Wright, the Genesee County Drain Commissioner, also seeks to affirm the district court's dismissal of the *Mays* Plaintiffs' claims for failure to plead facts showing that they are entitled to relief against him.  For the reasons explained above, we decline to analyze whether the Plaintiffs have stated a claim against Wright under Rule 12(b)(6).  But we also note that Wright's brief does not make any independent 12(b)(6) arguments and only seeks to incorporate his arguments from a motion to dismiss filed before the district court.  We "explicitly disallow[] the incorporation by reference into appellate briefs of documents and pleadings filed in the district court." *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 453 (6th Cir. 2003).  Such an attempt to incorporate by reference "does not comply with the Federal Rules of Appellate Procedure." *Id.* at 452; *see also* Fed. R. App. P. 28(a)(8).

that the official can perform his functions without harassment or intimidation or insulation from political influence. *See Flying Dog Brewery*, 597 F. App'x at 348–49. The Defendants' conclusory arguments do not merit an extension of the absolute immunity doctrine.

The MDEQ Defendants also argue that the § 1983 claims in *Mays* are barred by qualified immunity. "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The test for qualified immunity is two-pronged, and the plaintiff must show that the official's conduct (1) violated a constitutional right, and (2) that the right was clearly established. *Silberstein*, 440 F.3d at 311; *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (requiring that the plaintiff establish that the official's action was "objectively unreasonable in light of the clearly established constitutional rights").

The first part of this test involves determining whether the *Mays* Plaintiffs have alleged a constitutional violation. Because we have declined to analyze the merits of the Plaintiffs' claims, we also decline to determine whether qualified immunity applies in the first instance. We deny the request to affirm the district court's dismissal on the basis of absolute or qualified immunity.

*b.* Respondeat Superior

Finally, the MDEQ Defendants argue that the claims in *Mays* against Wyant, Shekter Smith, and Busch are based on the premise that they, as former directors and supervisors within the MDEQ, are liable for "any alleged wrongful conduct of the entire MDEQ/ODWMA/Lansing District, regardless of their level of direct involvement." This, the Defendants assert, impermissibly rests the § 1983 claims against them on the doctrine of *respondeat superior*, or supervisor liability. *See Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) ("Section 1983 will not support a claim based on a *respondeat superior* theory of liability.") (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). The Plaintiffs respond that their claims against these MDEQ Defendants rest on their own personal conduct.

Indeed, the *Mays* Complaint specifically alleges that Wyant participated in the decision to switch the City of Flint's water supply to the KWA.  It alleges that Shekter Smith expressed concern that Flint water would be publicly linked to the outbreak of Legionnaire's disease, and also acknowledged that the water problems in Flint were due to "corrosion across the distribution system."  The Complaint alleges that Busch was on notice that the water treatment plant was not ready at the time Flint switched water supplies, and falsely told the EPA that the City of Flint was using corrosion control on its water supply.  Finally, the Complaint alleges that both Busch and Shekter Smith received an EPA report concerning elevated levels of lead in the Flint water supply, and failed to undertake any measures to address the dangers to the public.  These allegations concern the individual conduct of the MDEQ Defendants, and their own participation in the alleged violations of the Plaintiffs' substantive due process rights.  They do not rely on *respondeat superior*, and we deny the request to affirm the district court's dismissal on this ground.

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's dismissal of the Plaintiffs' § 1983 claims as precluded by the SDWA.  We **AFFIRM** the dismissal of the Plaintiffs' claims against the State of Michigan in *Mays*, and against the State of Michigan, MDEQ, MDHHS, and Governor Snyder in *Boler*, on the basis of Eleventh Amendment sovereign immunity. We **REMAND** the cases for further proceedings in accordance with this opinion.